DECISION AND JUDGMENT ENTRY
{¶ 1} This is a consolidated appeal from four separate judgments in which the Lucas County Court of Common Pleas: 1) denied a motion for summary judgment filed by appellant, Intercargo Insurance Company ("Intercargo"); 2) allowed appellee, TOL Aviation, Inc. ("TOL") and plaintiff, Richard Nensel, to amend the complaint to conform to evidence presented at a bench trial; 3) found appellant did not negotiate with appellee and a third party in good faith and ordered appellant to pay appellee $25,397.14 in attorney fees and damages in an underlying action; and 4) ordered appellant to pay appellee costs in the amount of $711.49 and additional attorney fees in the amount of $29,655 in a direct action between appellant and appellee. On appeal, appellant sets forth the following seven assignments of error:
 {¶ 2} "I. The court erred in failing to grant defendant, Intercargo Insurance Company's motion for summary judgment * * *.
 {¶ 3} "II. The court erred in allowing plaintiff to conform his pleading to the proof.
 {¶ 4} "III. The court erred in finding that defendant, Intercargo Insurance Company, acted in and committed bad faith in dealing with its insured.
 {¶ 5} "IV. The court erred in finding defendant, Intercargo Insurance Company, and retainees had conflicts of interest giving rise to a valid claim for attorney fees and costs in the Bahret Litigation.
 {¶ 6} "V. The court erred in finding plaintiff, TOL Aviation, Inc., has a valid and substantive right of reimbursement of $25,397.14.
 {¶ 7} "VI. The finding of fact, conclusions of law, and judgment entry were against the weight of the evidence.
 {¶ 8} "VII. The court erred in awarding attorney fees and expenses to TOL Aviation."
 {¶ 9} This case involves a dispute between an insurance company and its insured. At issue is whether appellant, Intercargo, negotiated in bad faith on behalf of its insureds, appellees, TOL, and Nensel, during the course of litigation between appellees and a third party, attorney Robert Bahret ("Bahret litigation"). Accordingly, we will review the facts of the Bahret litigation before considering the facts and issues raised in this appeal.
 Bahret Litigation {¶ 10} On April 17, 2001, Chester Rzeznick, a TOL employee, attached a towbar to a private airplane owned by attorney Robert Bahret, during what started out to be a routine 50-hour maintenance inspection. However, after pulling the aircraft out of its hangar, Rzeznick attempted to start the engine with the towbar still attached. Two of the propeller's blades struck the towbar and were severely damaged. Rzeznick removed the damaged propeller and made arrangements with Tiffin Aire, Inc. ("Tiffin Aire") in Tiffin, Ohio, to evaluate the damage. Rzeznick reported the incident to his employer, appellee Nensel, who told Rzeznick to inform Bahret of the damage.
 {¶ 11} Several hours later, Rzeznick telephoned Bahret and told him the maintenance inspection revealed "severe corrosion" on the plane's propeller, necessitating its removal. Rzeznick told Bahret not to come to the airport, since the propeller was already on its way to Tiffin Aire for evaluation and repair. Rzeznick did not tell Bahret about the propeller strike. The next day, Nensel contacted appellant, Intercargo, to initiate an insurance claim. Nensel told the insurance company that Rzeznick damaged the propeller, and asked Intercargo to pay for replacing the propeller.
 {¶ 12} On June 2, 2001, Nensel and Bahret had a meeting where, for the first time, Nensel told Bahret the propeller was damaged by a propeller strike. Nensel also told Bahret the propeller was corroded and, therefore, had to be replaced. Nensel stated that, if the propeller had not been damaged, Bahret would have paid the entire cost of its replacement; however, since part of the damage was due to Rzeznick's actions, TOL's insurance policy would cover the cost of replacement, less a $2,500 deductible.
 {¶ 13} Based on the above information, Bahret signed a release. Bahret then contacted Brad Newman, the owner of Tiffin Aire, who told Bahret the propeller strike caused significant damage to the aircraft, and corrosion was of no significance in the decision to replace the propeller. Newman also told Bahret the plane was severely damaged and the engine should be torn down, inspected, and possibly overhauled. Bahret then called Nensel and expressed concern about the cost of the engine repair and the diminished value of the airplane due to its "damage history."
 {¶ 14} On June 26, 2001, Bahret sent Nensel a letter in which he complained about the "events surrounding the 50 hour inspection" of the airplane and the conflicting reports as to whether the propeller was damaged by corrosion or a propeller strike. In addition, Bahret stated he was told by other airplane mechanics that the engine should be torn down and inspected. Finally, Bahret stated the bill he received for the maintenance inspection was artificially inflated. Bahret concluded the letter as follows:
 {¶ 15} "The bottom line is that I am not going to pay you five cents towards the bill that you sent me and I most definitely will be presenting you a bill for the additional damages caused to my plane including whatever the inspection reveals. The release that you asked me to sign when I was in your office was clearly procured by fraud and is of no concern to me whatsoever. In fact, please give me the name of the insurance adjuster that you dealt with. I am reasonably certain that the adjuster's file will contain evidence of your fraud since you probably told that adjuster that the propeller had been destroyed in the propeller's strike, as opposed to any corrosion issues that you were telling me. I want to talk to the adjuster to discuss the additional damages to my plane caused by your mechanic's negligence."
 {¶ 16} Intercargo paid the cost of replacing the propeller, minus the $2,500 deductible. On June 28, 2001, Nensel sent a letter to Michael Savin, Intercargo's claims adjuster, in which Nensel stated the claim should "be re-opened for additional work found needed [sic] and that the `Release' signed by the aircraft owner, Mr. Robert Bahret, should be placed in hold." In support, Nensel stated that, after reviewing the engine manufacturer's specifications, it is clear the engine should be disassembled and inspected following a propeller strike. Nensel asked Savin to contact Bahret directly to discuss the situation.
 {¶ 17} In July and August 2001, Bahret sent several letters to Savin in which he discussed the cost of various issues, including replacement of the propeller; tear down and inspection of the engine; interest accrued on the amount of the unpaid damages; and cost of airplane rentals while Bahret's plane was being repaired. In addition, in a letter to Savin dated August 8, 2001, Bahret stated he would not sign another release until all damages were paid, including claims against TOL and Nensel that were arguably not covered by insurance.
 {¶ 18} On August 31, 2001, Bahret filed a complaint against TOL, Nensel and Rzeznick in the Lucas County Court of Common Pleas. In the complaint, Bahret alleged Nensel made statements that were "intentionally fraudulent [and] false," to induce Bahret to sign the release. The complaint also alleged the propeller was damaged due to Rzeznick's negligence, and TOL's and Nensel's subsequent cover-up and inflated maintenance bill violated the Ohio Consumer Sales Practices Act, R.C. 1345.02. The complaint further alleged that TOL's, Nensel's and Rzeznick's concealment of the actual cause of the damage was "grossly negligent," "callously indifferent," and made with "conscious disregard" for the safety of Bahret and others who were passengers in the aircraft after the propeller strike.
 {¶ 19} Robert Kern, counsel for Intercargo, hired counsel to represent TOL, Nensel and Rzeznick for all claims made in the complaint, regardless of whether they were covered by insurance. In addition, TOL retained independent counsel. All parties agreed Intercargo was responsible for the cost of the tear down, inspection and additional repairs to the airplane's engine, in the amount of $15,796.85. However, despite Bahret's repeated requests, Intercargo did not pay for the additional repairs as promised.
 {¶ 20} In January 2002, the complaint was amended to include Intercargo as a defendant. In addition to repeating the above claims against TOL, Nensel and Rzeznick, the amended complaint alleged that Intercargo breached its duty to compensate Bahret for the additional engine repairs. Collectively, the amended complaint sought actual damages from TOL, Nensel, Rzeznick and Intercargo in the amount of $100,000, and punitive damages in the amount of $5,000,000.
 {¶ 21} All the attorneys retained by Intercargo reported to Intercargo's lead counsel, Robert Kern. In addition, Intercargo retained separate counsel to defend itself against Bahret's claims that were arguably not covered by insurance. Thereafter, all parties opened negotiations, in an attempt to resolve all of Bahret's claims. Those attempts included numerous letters and telephone calls, and a failed attempt at mediation.
 {¶ 22} On September 24, 2002, Intercargo paid Bahret $15,796.85 for the additional damages to Bahret's plane; however, Bahret did not immediately cash Intercargo's check. On October 8, 2002, a global settlement was reached whereby all of Bahret's outstanding claims, covered and non-covered, were resolved in exchange for $50,000. Of that amount, $15,796.85 was credited to Intercargo and $3,000 was paid by Rzeznick. The remaining $31,203.15 was paid by TOL and Nensel. Thereafter, the entire complaint was dismissed.
 Litigation between TOL and Intercargo {¶ 23} On April 2, 2003, TOL and Nensel filed a complaint, in which they alleged that Intercargo "acted willfully, fraudulently, intentionally, and in bad faith" by: 1) delaying the $15,796.85 payment to Bahret for additional repairs to the airplane; and 2) failing to "fully indemnify" TOL and Nensel against all of Bahret's claims. The complaint also alleged that Intercargo's actions: 1) caused Nensel to suffer "mental anguish and emotional distress;" and 2) were the "direct and proximate" cause of Bahret's decision to file a lawsuit against TOL, Nensel and Rzeznick. Collectively, TOL and Nensel sought damages from Intercargo in the amount of $50,000 for economic loss and $250,000 for emotional distress, as well as punitive damages, costs, and attorney fees.
 {¶ 24} Intercargo filed an answer on April 24, 2003. On June 28, 2004, Intercargo filed a motion for summary judgment, in which Intercargo asserted it is entitled to judgment as a matter of law. In support, Intercargo argued that it did not act in bad faith, because it paid the covered portion of Bahret's claim. Attached to Intercargo's motion were copies of the complaint and amended complaint, and a copy of the June 28, 2001 letter from Nensel asking Savin to put the Bahret release "in hold."
 {¶ 25} In further support of its motion, Intercargo relied on Bahret's deposition testimony, in which Bahret stated he signed the release believing the propeller was the only necessary repair. Bahret further stated that Savin later told Bahret the release was signed with "inadequate information" and would not "stand up to a challenge." Bahret testified he was not timely reimbursed by Intercargo for the additional engine repairs and the cost of a replacement plane while repairs were done; however, he probably would have sued TOL and Nensel regardless of Intercargo's actions.
 {¶ 26} On cross-examination, Bahret testified that Rzeznick told him the propeller had to be replaced because of "severe corrosion." Bahret further testified that Nensel said Bahret was a "lucky man" because insurance would pay for the damaged propeller. Bahret stated that he was willing to pay "at least part" of Nensel's $2,500 deductible until he found out the propeller had to be replaced because of damage and not corrosion. Finally, Bahret stated that Intercargo paid him the $15,796.85 for the engine repair in the summer of 2002; however, he did not cash the check because he wanted a "global settlement" of all claims against Intercargo, TOL, Nensel and Rzeznick.
 {¶ 27} On July 16, 2004, TOL filed a reply in which it argued that Intercargo is not entitled to summary judgment. In support, TOL claimed Intercargo breached its duty to act in good faith by agreeing with Bahret that the release was unenforceable, and by not acting quickly on its promise to pay $15,796.85 for the additional engine repairs. Attached to TOL's reply was Nensel's affidavit, in which Nensel stated the release was valid because, at the time it was signed, both he and Bahret believed an engine teardown was not necessary. Nensel further stated that, in his opinion, Bahret filed suit against him and TOL because the insurance company "dragged its feet" and refused to "make good" on its promise to reimburse Bahret for the additional engine repairs.
 {¶ 28} On October 15, 2004, the trial court filed a judgment entry in which it found that, as a matter of law, an insurance company's "duty of good faith extends to [TOL's] claim that Intercargo undercut its insured in the handling of Mr. Bahret's claim." The trial court further found that genuine issues of fact remained as to: 1) whether Intercargo breached its duty by agreeing with Bahret that the release was unenforceable; and 2) whether Intercargo's delay in paying the for the additional engine repairs proximately caused Bahret to file suit against TOL and Nensel. Accordingly, Intercargo's motion for summary judgment was denied.
 {¶ 29} On June 7, 2005, TOL filed a motion for in camera inspection of emails and letters between Intercargo's representatives and the attorneys hired by Intercargo to defend TOL, Nensel and Rzeznick during the course of the Bahret litigation. On June 9, 2005, the trial court granted TOL's request.[1]
 {¶ 30} The documents admitted by the trial court included a copy of correspondence between Intercargo's counsel, Jen Fleming, and Kern, dated January 31, 2002, in which Fleming told Kern "this whole case may settle for $35,000," and stated that TOL's private attorney "did not want a settlement which did not include a full release of claims against the insured, TOL Aviation." Also included were copies of correspondence between Intercargo's attorney, Dan Marinik, and Kern, dated March 4, April 16, and June 26, and July 17, 2002, respectively.
 {¶ 31} In his March 4 letter to Kern, Marinik placed Intercargo's liability at "approximately $15,000," and the diminished value of the airplane at "some $19,000." In his April 16 letter, Marinik stated that, after attending Nensel's deposition, Marinik believed Nensel was "not the best witness" because he wanted to "have his cake and eat it too." In his June 26 letter, Marinik told Kern he intended to settle Bahret's claim against Intercargo and draft a release that included "all the necessary language and provision to effectively remove Intercargo as a party while not precluding [Bahret] from pursuing his `claims' against Mr. Nensel." In his July 17 letter, Marinik told Kern that Intercargo's settlement offer of $13,654.73 was rejected, because Bahret wanted to keep Intercargo in the lawsuit as leverage against TOL.
 {¶ 32} In addition to the above, the trial court admitted into evidence a letter from Marinik to Bahret, dated August 1, 2002, in which Marinik offered to settle Bahret's claim against Intercargo for $15,796.85. In addition, Marinik stated "[a]s I indicated in the past, [Intercargo] is interested in resolving the claims specifically brought by you against it first, and then proceed [sic] to determine whether any other remaining issues between you and Messrs. Nensel, Rzeznick, and TOL Aviation can be resolved amicably."
 {¶ 33} The case proceeded to a bench trial on June 24, 2005. Nensel testified on direct examination that Rzeznick told him about the propeller strike on April 17, 2001. Nensel stated he notified Intercargo and initiated a claim that day; however, he did not meet with Bahret until June 2, 2001. Nensel further stated Bahret offered to "contribute" toward the $2,500 deductible when he found out Nensel's "business was bad," and Nensel asked Savin to pay for the engine tear down because it was "relative to the occurrence" and was "part of the overall one package."
 {¶ 34} As to his claim against Intercargo, Nensel testified that Intercargo's individual payment of Bahret's claim caused TOL to pay more money than if all parties had participated earlier in a "global settlement." Specifically, Nensel stated TOL paid $31,203.15 in damages and $14,143.01 in attorney fees in the Bahret case.
 {¶ 35} On cross-examination, Nensel stated he hired separate counsel because he "did not trust" the attorneys hired by Intercargo, and he found out after the failed mediation that Bahret agreed to dismiss the claim against Intercargo in exchange for $15,796.85. Nensel concluded that Intercargo's failure to pay for the tear down in August 2001, constituted bad faith.
 {¶ 36} Nensel's pre-trial deposition testimony was also introduced at trial, in which Nensel testified that he first saw Bahret's damaged plane after the propeller had been removed; however, he did not see any rust on the propeller. Nensel stated it was Rzeznick's job to tell Bahret about the propeller strike, and Bahret should not have to disclose the plane's damage history unless asked by a prospective buyer.
 {¶ 37} On cross-examination, Nensel testified that he decided to replace, rather than repair, the propeller because he thought the cost was about the same. Nensel also testified the $2,500 deductible was eventually deducted from Rzeznick's paycheck.
 {¶ 38} In addition to Nensel's trial and deposition testimony and Bahret's deposition testimony, Savin's and Rzeznick's pre-trial depositions were introduced into evidence. Savin testified in his deposition that he provided Nensel with the release in June 2001. Savin also testified that Nensel was "less than candid" in explaining to Bahret why the propeller had to be replaced. Savin stated that Bahret was determined to sue TOL and Nensel, and would not sign a general release. He also stated that partial payment to Bahret at an earlier time would not have prevented the lawsuit, because Bahret wanted "the pound of flesh from TOL because they damaged his aircraft and now he couldn't sell it for what he thought he could sell it before the incident."
 {¶ 39} In his deposition, Rzeznick testified that the propeller blades turned "eight to ten times" before he shut the engine off, and the propeller hit the towbar after "four to five turns." Rzeznick stated he removed the cowling off the engine and took the propeller off; however, he was not qualified to inspect and evaluate the propeller. Rzeznick testified he told Bahret the propeller was corroded, not that it was damaged by the towbar.
 {¶ 40} Rzeznick stated the cost of replacing the propeller was approximately $3,000 higher than repairing it. He further stated that, pursuant to the manufacturer's service bulletin, the engine should be completely disassembled and inspected after a propeller strike, which is defined as "any incident, whether or not the engine is operating, that requires repair to the propeller other than minor dressing of the blades."
 {¶ 41} In addition to the exhibits and testimony summarized above, TOL introduced into evidence copies of the above-referenced documents obtained after the trial court's in camera inspection. At the close of the evidence, TOL made an oral motion to conform the pleadings to the evidence presented at trial. Specifically, TOL asked for permission to amend the complaint against Intercargo to include a claim for damages due to "conflicts of interest" and "undercutting" during Intercargo's negotiations with Bahret. The trial court granted TOL's motion, over Intercargo's objection, and ordered both parties to submit post-trial briefs on the issue.
 {¶ 42} On August 30, 2005, the trial court filed a judgment entry in which it found, based on the evidence presented at trial, that TOL and Nensel paid Bahret $31,203.15 to settle Bahret's claims; forgave an additional $1,550.98 owed by Bahret; and incurred $14,143.01 in private attorney fees defending the Bahret lawsuit. The court concluded that: 1) Intercargo "acted in and committed bad faith in its dealing with its insured * * *;" and 2) TOL and Nensel have a "valid and substantive right of reimbursement from [Intercargo] for its payment and waiver in its settlement with Bahret" minus the $2,500 deductible and the $19,000 paid for diminished value of the airplane. Accordingly, Intercargo was ordered pay TOL $25,397.14, plus interest.
 {¶ 43} On September 14, 2005, TOL filed a motion for attorney fees in its lawsuit against Intercargo, in which TOL sought reimbursement for $711.49 in costs, $34,282.49 in attorney fees, and prejudgment interest. In a supporting memorandum, TOL asserted it was entitled to the additional attorney fees because Intercargo acted in bad faith. Specifically, TOL claimed Intercargo had a conflict of interest; it had not acted in the best interest of TOL and Nensel during the Bahret negotiations; and it did not convey all of Bahret's settlement offers to TOL. Attached to the motion were the affidavits of attorneys Cary Rodman Cooper, Richard M. Kerger, R. Michael Frank, and W. David Arnold, all of whom testified as to the reasonableness of the amount of attorney fees sought from Intercargo.
 {¶ 44} On September 22, 2005, a notice of appeal was filed from the trial court's denial of Intercargo's motion for summary judgment, the granting of TOL's motion to conform the pleadings to the evidence at trial, and the August 30, 2005 judgment entry ("case no. L-05-1308").
 {¶ 45} On December 20, 2005, a hearing was held on the motion for additional attorney fees, at which counsel for both parties presented arguments. On January 12, 2006, Intercargo filed a post-hearing brief in opposition to the motion for attorney fees. On January 13, 2006, the trial court filed a judgment entry in which it found that "it must award [TOL] its attorneys' fees and the costs and litigation expenses incurred herein." The trial court ordered Intercargo to pay TOL $711.49 in costs and litigation expenses, and $29,655 for additional attorney fees. Prejudgment interest was not awarded. On February 17, 2006, Intercargo filed a timely notice of appeal ("case no. L-06-1060"). On February 24, 2006, this court consolidated appellate case nos. L-05-1308 and L-06-1060 under case no. L-05-1308.
 Issues Raised on Appeal {¶ 46} In its first assignment of error, Intercargo asserts the trial court erred by denying its motion for summary judgment. In support, Intercargo argues that TOL cannot show bad faith in this case because Intercargo did not wrongfully refuse to pay anycovered claims against TOL, and the record contains evidence of Bahret's intent to sue TOL, regardless of whether the release was enforceable. In support, Intercargo cites testimony that Bahret decided to sue TOL "three seconds" after speaking to Newman, who first told Bahret the propeller was damaged by a strike, and not by corrosion.
 {¶ 47} We note at the outset that an appellate court reviews a trial court's granting of summary judgment de novo, applying the same standard used by the trial court. Lorain Natl. Bank v.Saratoga Apts. (1989), 61 Ohio App.3d 127, 129; Grafton v. OhioEdison Co. (1996), 77 Ohio St.3d 102, 105. Summary judgment will be granted when there remains no genuine issue of material fact and, after construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).
 {¶ 48} In this case, the trial court analyzed case law in existence at the time Intercargo's motion for summary judgment was filed. Specifically, the trial court noted that, in Ohio, "an insurance company commits bad faith if it unreasonably refuses to pay a claim, Zoppo v. Homestead Ins. Co. (1994),71 Ohio St.3d 552, or defend its insured, Grange Mut. Cas. Co. v. Rosko
(2001), 146 Ohio App.3d 698." In addition, the trial court citedHoskins v. Aetna Life Ins. Co. (1983), 6 Ohio St.3d 272, which holds that Ohio law imposes on insurance companies "a duty to act in good faith in handling the claims of its insured and the claims of third persons against its insureds." Id. At 275.
 {¶ 49} After citing the above cases, the trial court recognized that Intercargo did, ultimately, pay the claim. However, after stating it found no authority "directly analogous" to the facts in this case, the trial court accepted TOL's argument "that the duty of good faith extends to [TOL's] claim that Intercargo undercut its insured in the handling of Mr. Bahret's claim."
 {¶ 50} Since the trial court's judgment was filed in October 2004, at least one Ohio appellate court has held that an insurance company's duty of good faith should be extended beyond those scenarios involving an outright denial of payment for a claim. See Unklesbay v. Fenwick, 2nd Dist. No. 2005-CA-108,2006-Ohio-2630 (In Ohio, an insurer's responsibilities under a policy of insurance extend to "the handling and payment of an insured's claim." Id., at ¶ 14, citing Hoskins, supra, (Emphasis added.) Accordingly, on consideration of the foregoing, we agree with the trial court that Intercargo's duty to act in good faith extended to the proper handling of TOL's claim.
 {¶ 51} As set forth above, the following facts are undisputed: Nensel did not initially tell Bahret the truth about how the propeller was damaged; Bahret signed the release before he knew a costly engine tear down was necessary; and Nensel told Intercargo to put the release "in hold" after Bahret insisted on an engine tear down. In addition, the record contains Savin's admission that the release was unenforceable; and Bahret's deposition testimony that he intended to sue TOL and Nensel, regardless of Intercargo's actions. Bahret, himself an attorney specializing in insurance defense, testified the release was unenforceable because it was procured by fraud. The record also contains evidence that Intercargo agreed to pay $15,796.85 to replace the propeller; however, the claim was not paid until after Bahret included Intercargo as a defendant in the lawsuit.
 {¶ 52} Upon consideration of the foregoing, we find the record contains sufficient evidence to raise a genuine issue of material fact as to whether Intercargo acted in bad faith, i.e., whether the insurance company properly handled Bahret's claims on TOL's behalf. Accordingly, the trial court did not err by finding summary judgment to Intercargo was precluded in this case. Intercargo's first assignment of error is not well-taken.
 {¶ 53} In its second assignment of error, Intercargo asserts the trial court erred by allowing TOL to amend its complaint to conform to evidence presented at the bench trial. In support, Intercargo argues it did not consent to litigating the issue of conflict of interest, and claims it was substantially prejudiced by the trial court's ruling.
 {¶ 54} Civ.R. 15 generally governs the amendment of pleadings. Pursuant to Civ.R. 15(A), a party may amend his pleading once before a responsive pleading is served or, later, "by leave of court or by written consent of the adverse party. Leave of court shall be freely given when justice so requires. * * *" Civ.R. 15(B), which governs the amendment of pleadings to conform to the evidence presented at trial states, in relevant part:
 {¶ 55} "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment. * * *"
 {¶ 56} In determining whether the parties impliedly consented to litigation of an unpleaded issue, the trial court must look at several factors: "(1) `whether they recognized that an unpleaded issue entered the case' (2) `whether the opposing party had a fair opportunity to address the tendered issue or would offer additional evidence if the case were to be retried on a different theory; and (3) `whether the witnesses were subjected to extensive cross-examination on the issue.'" Sheperak v. Ludlow,
6th Dist. No. F-03-011, 2004-Ohio-3155, at ¶ 16, quoting State,ex rel. Evans v. Bainbridge, (1983), 5 Ohio St.3d 41, 45-46. Generally, a court's decision to grant or deny a motion to amend the pleadings under Civ.R. 15(B) will not be reversed on appeal absent a finding of gross abuse of discretion. Sheperak, supra, citing State, ex rel. Evans, supra.
 {¶ 57} A review of the trial transcript shows TOL sought to amend the pleadings based on documents that came into TOL's possession only after the trial court conducted an in camera inspection and ruled they were discoverable. Prior to the trial court's ruling, Intercargo claimed the documents were privileged. As set forth above, the documents included correspondence between Intercargo's then-counsel, Dan Marinik,[2] Savin, and other Intercargo executives. The issue addressed therein was Intercargo's attempt to extricate itself from the Bahret litigation without necessarily resolving Bahret's claims against TOL, Nensel, and Rzeznick.
 {¶ 58} In support of its motion TOL argued that, before obtaining copies of the documents, it was not aware of Intercargo's attempt to negotiate with Bahret on its own behalf leaving TOL, Nensel and Rzeznick to fend for themselves. TOL claimed that, as a result of Intercargo's conflicts of interest, TOL's position with Bahret was "undercut" and it was forced to pay a higher price to settle Bahret's non-covered claims. TOL further argued that Intercargo had possession of the documents at all times relevant to the lawsuit, and Intercargo's counsel was aware TOL initially asked the trial court to release the documents so it could pursue its theories of conflict of interest and "undercutting." In response to TOL's arguments, Intercargo's counsel stated:
 {¶ 59} "Frankly, I am not concerned about the undercutting or the conflict of interest, but I just want to make clear what we're talking about because I may want to have an opportunity, Judge, to rebut those kinds of things with the appropriate people. I — I wasn't aware it was going to be an issue in this case, it's not in the pleadings."
 {¶ 60} After the above discussion, the trial court allowed the amendment to the complaint, and further allowed Intercargo to amend its answer to include a denial of the additional allegations. Intercargo did not object to the introduction of the documents into evidence, and it did not specifically ask for a continuance to obtain additional evidence. Both parties were ordered to submit post-trial briefs on the issue within two weeks.
 {¶ 61} On July 8, 2006, both parties submitted post-trial briefs. In its post-trial brief, TOL reasserted its position that the documents obtained through court-ordered discovery show "a conflict arose between the interests of Intercargo as agent for the three insureds and as principal for itself" when Bahret named Intercargo as a separate defendant. In its post-trial brief, Intercargo argued that the record contained no evidence in support of TOL's "undercutting" theory. Intercargo also argued that "the exhibits submitted herein do not reveal conflict [of interest] at all." Rather, Intercargo asserted the record shows counsel for all parties cooperated throughout the Bahret litigation, in order to obtain a "complete release for TOL."
 {¶ 62} On consideration of the foregoing, it is clear that Intercargo was aware of the content of the documents in question before and during the trial. After the trial court made its ruling, both parties were given an opportunity to present briefs on the additional allegations raised in the amended complaint. Under such circumstances, we cannot say the trial court's decision to grant TOL's request to amend the pleadings constituted a gross abuse of discretion. Intercargo's second assignment of error is not well-taken.
 {¶ 63} In its third assignment of error, Intercargo asserts that the trial court erred by finding Intercargo exhibited bad faith in its dealings with TOL and Nensel. In support, Intercargo argues that its delayed payment of Bahret's claim cannot form a basis for a bad faith action under Ohio law. We disagree.
 {¶ 64} Ohio courts have stated that "bad faith" on the part of an insurer is the functional equivalent of "[a] lack of good faith." Netzley v. Nationwide Mut. Ins. Co. (1971),34 Ohio App.2d 65, 72. Generally, an insurer has a duty to exhibit good faith toward its insured as part of carrying out its duties
under a contract of insurance. Unklesbay v. Fenwick, supra, at ¶ 14, citing Hoskins, supra, at paragraph one of the syllabus. "Those responsibilities include the handling and payment of an insured's claim." Id. Accordingly, even in cases where a claim is ultimately paid, "the insurer's foot-dragging in the claims-handling and evaluation process could support a bad-faith cause of action." Id., citing Mundy v. Roy, Clark App. No. 2005-CA-28, 2006-Ohio-993. However, an allegation of bad faith made for the way an insurer handled a claim for coverage "is only met if the record shows that there were no circumstances in the case that created a reasonable justification for the insurer's actions." Bennett v. Butler (June 30, 2000), 6th Dist. No. L-99-1151, citing Zoppo, supra, at the syllabus.
 {¶ 65} In this case, the record contains no reasonable explanation as to why TOL's attorneys were not told about Bahret's $34,500 settlement offer. In addition, the record shows that: 1) Savin told Bahret the release was unenforceable, based on Savin's evaluation of Nensel's conduct after the propeller was damaged; 2) Intercargo inexplicably delayed payment to Bahret for the engine tear down after it agreed to pay $15,796.85; 3) behind-the-scenes negotiations to resolve Bahret's claim against Intercargo were taking place while TOL, Nensel, Bahret and Intercargo were attempting to resolve all Bahret's outstanding claims through mediation; 4) it was not until after the mediation attempt failed, and Intercargo settled its own portion of the claim, that TOL and Nensel became aware of the original $34,500 settlement offer; and 5) all of Bahret's claims were eventually settled for $50,000, of which $31,203.15 was paid by TOL, Nensel, and Rzeznick.
 {¶ 66} On consideration of the foregoing, we find the record supports the trial court's conclusion that Intercargo and its employees "acted in and committed bad faith in its dealing with its insured * * *." Intercargo's third assignment of error is not well-taken.
 {¶ 67} In its fourth assignment of error, Intercargo asserts the trial court erred by finding Intercargo had "conflicts of interest" and acted in "bad faith," thereby entitling TOL to its attorney fees and "costs" incurred in the Bahret litigation.
 {¶ 68} As set forth in our determination of appellant's third assignment of error, the record supports the trial court's finding that Intercargo's handling of TOL's insurance claim amounted to bad faith. Accordingly, the trial court did not abuse its discretion by finding TOL was entitled to reimbursement of its attorney fees and costs incurred in the Bahret litigation on that basis. Appellant's fourth assignment of error is not well-taken.
 {¶ 69} In its fifth assignment of error, Intercargo asserts that the trial court erred by ordering Intercargo to pay $25,397.14 in damages and attorney fees incurred in the Bahret litigation. We begin our analysis by noting that the trial court's calculation started with the $31,203.15 settlement payment from TOL to Bahret. From that amount, the trial court deducted $19,000 for the diminished value of Bahret's airplane, and $2,500 for the insurance deductible. Then, the trial court added back $1,550.98, the amount of Bahret's invoices that were forgiven by Nensel, and $14,143.01 in attorney fees paid by Nensel to defend TOL in the Bahret litigation. The result was a $25,397.14 award to TOL.
 {¶ 70} Intercargo disputes the amount of the award on two grounds. First, Intercargo argues the award is improper because it forces Intercargo to reimburse TOL for payment of claims that were not covered by insurance, including claims of fraud. Second, Intercargo claims it never should have been ordered to pay attorney fees incurred in the Bahret litigation, since Nensel hired a private attorney for the express purpose of defending himself and TOL from liability for acts which were never covered by insurance. In determining this assignment of error, we will address each of these issues separately.
 {¶ 71} Generally, an award of actual damages will not be disturbed on appeal if the record contains some competent, credible evidence supporting the trial court's decision.Victorian Room Banquet Ctr. v. Bernard, 11th Dist. No. 2006-T-0010, 2006-Ohio-4946, at ¶ 9. On appeal, "we must indulge every reasonable presumption in favor or the lower court's judgment and finding of facts." Id., citing Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77. In so doing, if the evidence is susceptible of more than one interpretation, we are required to construe it consistently with the lower court's judgment. Id. (Other citations omitted.)
 {¶ 72} As set forth above, it is undisputed that: 1) Savin told Bahret the release was unenforceable; 2) Intercargo did not inform TOL's attorneys of the $34,500 settlement offer until after the mediation attempt failed; and 3) TOL's share of the $50,000 settlement was higher than it would have been if the $34,500 offer had been accepted. On that basis, the trial court determined that TOL's uncovered liability, but for Intercargo's bad faith, would have been limited to the $2,500 deductible and $19,000 for the diminished value of Bahret's airplane.
 {¶ 73} On consideration of the foregoing, we find the record contains competent, credible evidence to support the trial court's finding that TOL incurred additional damages for the uncovered claims as a result of Intercargo's bad faith. Accordingly, the trial court did not err by ordering Intercargo to reimburse TOL for a portion of the uncovered claims. Intercargo's first argument is without merit.
 {¶ 74} As to whether TOL should have been reimbursed for attorney fees in the Bahret litigation, we note that Ohio courts generally refuse to allow a prevailing party to recover attorney fees "absent a statute providing for such an award." Brown v.Guarantee Title Trust/ARTA, (Aug. 28, 1996), 5th Dist. No. 94-41, citing Sorin v. Bd. of Ed. (1976), 46 Ohio St.2d 177. However, an exception to the rule can arise if a party, particularly an insurance company, has acted in bad faith.Brown, supra. See, also, Vance v. Roedersheimer,64 Ohio St.3d 552, 556, 1992-Ohio-89 ("It has long been established in Ohio that an award of attorney fees must be predicated on statutory authorization or upon a finding of conduct which amounts to bad faith."). The underlying rationale is that such fees are "an economic loss-damages-which flow from and are proximately caused by the insurer's bad faith. Consequently, * * * an insured bringing a bad faith action may recover attorney fees as compensatory damages even if said insured has not demonstrated the existence of actual [or punitive] damages separate and distinct from said attorney's fees." Brown, supra. (Emphasis added, other citations omitted.)
 {¶ 75} A review of the record shows Nensel hired a private attorney to defend himself and TOL in regard to claims for which Intercargo refused coverage. As set forth above, the trial court reasonably concluded that TOL's defense on both the covered and uncovered claims was made significantly more difficult by Intercargo's behind-the-scenes negotiations with Bahret on Intercargo's own behalf. Therefore, we cannot say the trial court erred by ordering Intercargo to reimburse TOL attorney fees and costs incurred when TOL defended itself in the Bahret litigation.
 {¶ 76} As to the amount of those fees, it is well-settled that the decision to award attorney fees, and the amount of any such award, is within the sound discretion of the trial court.DiNunzio v. DiNunzio, 11th Dist. No. 2005-L-124,2006-Ohio-3888, at ¶ 70. On appeal, no abuse of discretion will be found if the appellate court is "able to determine the rationale underlying the award of fees, and the record supports the same * * *." Rendina v. Rendina, 11th Dist. No. 2003-L-193,2005-Ohio-4772, at ¶ 70.
 {¶ 77} In its August 30, 2005 judgment entry, the trial court found that TOL "incurred $14,143.01 in legal fees and costs in defending itself in the Bahret litigation" and ordered Intercargo to pay those fees. The trial court based its finding on undisputed evidence presented at trial as to the amount of those attorney fees. Under such circumstances, we cannot say the trial court abused its discretion. Intercargo's second argument is, therefore, without merit.
 {¶ 78} On consideration of the foregoing, we find the trial court did not err by ordering Intercargo to reimburse TOL $25,397.14 for damages, costs, and attorney fees incurred in the course of the Bahret litigation. Intercargo's fifth assignment of error is not well-taken.
 {¶ 79} In its sixth assignment of error, Intercargo asserts the trial court's findings of fact, conclusions of law and judgments in regard to the Bahret litigation were against the manifest weight of the evidence. In support, Intercargo claims it was Nensel's inconsistent and less-than-candid treatment of Bahret after the airplane was damaged, and not Intercargo's actions, that caused Bahret to file a lawsuit. In addition, Intercargo argues that the delay in paying Bahret for the engine tear down and inspection cannot be considered bad faith, since the claim was eventually paid. Finally, Intercargo argues that no evidence was presented that it "undercut" TOL's position by rejecting Bahret's initial settlement offer, or by agreeing with Bahret that the release was unenforceable.
 {¶ 80} On consideration of the entire record in this case, and our determinations as to Intercargo's first five assignments of error, we find the trial court's decision was not against the manifest weight of the evidence. Intercargo's sixth assignment of error is not well-taken.
 {¶ 81} In its seventh assignment of error, Intercargo asserts the trial court erred by ordering it to pay $29,665 in additional attorney fees incurred while TOL was pursuing its bad faith claim against Intercargo, without first finding TOL was entitled to punitive damages. In addition, Intercargo argues that conflicting evidence was presented as to the actual amount of TOL's attorney fees for this stage of the legal proceedings.
 {¶ 82} In support of its argument, Intercargo relies onZoppo v. Homestead Ins. Co., 71 Ohio St.3d 552, 1994-Ohio-461. In Zoppo, the Ohio Supreme Court held that:
 {¶ 83} "[A]n insurer who acts in bad faith is liable for those compensatory damages flowing from the bad faith conduct of the insurer and caused by the insurer's breach of contract.
 {¶ 84} "However, an insured is not automatically entitled to interest or attorney fees. * * * Attorney fees may be awarded [in a bad faith action] as an element of compensatory damages where the jury finds that punitive damages are warranted." Id., citingColumbus Finance, Inc. v. Howard (1975), 42 Ohio St.2d 178,183. See, also, Shock v. Motorists Ins. Co., 3rd Dist. No. 16-04-08, 2004-Ohio-6049 (A plaintiff is not entitled to attorney fees absent a finding of bad faith and an award of punitive damages. Id., at ¶ 21).
 {¶ 85} In response, TOL argues that Zoppo does not apply in this case, because additional attorney fees in its bad faith action are warranted pursuant to Brown, supra. We disagree, for the following reasons.
 {¶ 86} As set forth above, in Brown, supra, a finding of punitive damages was not necessary because the award of attorney fees was in the nature of direct compensation to the insured for the insurer's bad faith. Similarly, in this case, we found that reimbursement of attorney fees incurred by TOL in the Bahret litigation was in the nature of compensation for expenses resulting from Intercargo's bad faith. Accordingly, in that instance, we determined that punitive damages were not a prerequisite to an award which included attorney fees.
 {¶ 87} In contrast, in its January 13, 2006 judgment entry, the trial court awarded TOL "attorney fees and the costs and litigation expenses incurred [in its bad faith action against Intercargo]." However, the trial court did not find TOL is entitled to an award of punitive damages as a result of Intercargo's bad faith.
 {¶ 88} On consideration of the foregoing, we agree with Intercargo that the additional attorney fees awarded to TOL as a result of its bad faith lawsuit are not so much compensation to the insured as they are a punishment to the insurer. Under such circumstances, attorney fees cannot be awarded for an insurer's bad faith absent a finding that punitive damages are warranted. Therefore, the trial court erred by awarding additional attorney fees. Intercargo's seventh assignment of error is well-taken.
 {¶ 89} The judgment of the Lucas County Court of Common Pleas is affirmed in part and reversed in part. Specifically, the trial court's October 15, 2004, June 30, 2005, and August 30, 2005, are affirmed, and the trial court's January 13, 2006, judgment is reversed. The $29,655 award for additional attorney fees is hereby vacated, and the case is remanded to the trial court for further proceedings consistent with this opinion.
 {¶ 90} Appellant and appellee are ordered to share equally in the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED, IN PART AND REVERSED, IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Handwork, J., Singer, P.J., Parish, J., Concur.
[1] The trial court excluded from discovery "those documents related to 1) selection of legal counsel, 2) billings submitted by legal counsel and 3) ex parte mediation statements * * * [which] do not `cast light on bad faith on the part of the insurer,' * * *."
[2] During discovery, Marinik refused to release the correspondence on grounds that its contents were privileged. However, Marinik died before the case went to trial. It was after Marinik's death that TOL successfully sought to have the documents released.